In re BLACK & WHITE CATTLE CO.,
a California limited partnership,
Debtor.

BLACK & WHITE CATTLE CO., a California limited partnership,
Debtor-in-Possession, Plaintiff-Appellee,

v.

SHAMROCK FARMS COMPANY, an Arizona corporation; McLod Farms Company, an Arizona corporation; and Modesto Production Credit Association,
Defendants-Appellants.

BAP NO. CC–82–1610–VGAb.
Bankruptcy No. LA 82–06631–CA.
Adv. No. LA 82–3861–CA.

United States Bankruptcy Appellate Panels
of the Ninth Circuit.

Argued May 19, 1983.
Decided May 24, 1984.

Randolph J. Haines (argued), Lewis & Roca, Phoenix, Ariz., Richard M. Moneymaker, Moneymaker & Morrison, Los Angeles, Cal., for defendants-appellants.

Jeffrey C. Krause (argued), Isaac M. Pachulski, Stutman, Treister & Glatt, Los Angeles, Cal., for plaintiff-appellee.

Before VOLINN, GEORGE and ABRA-HAMS, Bankruptcy Judges.

VOLINN, Bankruptcy Judge.

A California statute, Cal.Civ.Code § 2980.5, provides, in pertinent part, that a contract for the feeding of dairy cattle must be recorded within 10 days after execution with the county recorder where the cattle are then located and also where the feedlot operator resides. Failing such recordation, after possession of the cattle by the feedlot operator, reservation of title or property in the cattle by their owner is void as to any good faith purchaser, encumbrancer, attaching, or levying creditor.

The issue before us is whether the bankruptcy estate of a feedlot operator will prevail over a previously perfected security interest, where the contract was not recorded under § 2980.5. The court below, on a motion for summary judgment, held that the bankruptcy estate prevailed over the secured party. We reverse.

**BACKGROUND**

Shamrock Farms Company, an Arizona corporation, and McLod Farms Company, an Arizona corporation (hereinafter referred to collectively as "Shamrock") owned a large herd of dairy cattle in Arizona. It borrowed funds for acquisition of cattle and dairy operations from Modesto Production Credit Association ("PCA"), a federally chartered credit cooperative.

On November 21, 1980, Shamrock entered into a contract in Phoenix, Arizona, with the plaintiff-debtor, Black & White Cattle Co. ("Black & White"), then a California general partnership, to feed Shamrock's younger cattle in Black & White's feedlot, prior to their transfer to the Shamrock milk herd in Arizona. Because it was unaware of the California livestock contracts recording statute, Cal.Civ.Code § 2980.5,[1] Shamrock did not record the agreement with the appropriate county recorder.

1. § 2980.5 Cal.Civ.Code provides:

*Definitions*

(a) As used in this section "contract" means any agreement, other than one intended to create a security interest (Section 9102(1)(a) of the Uniform Commercial Code), for the leasing of livestock or other animate chattels, or any agreement for the bailment or feeding of cattle of such breeds or crossbreeds as are primarily used for the production of milk for human consumption (hereinafter termed "dairy cattle"); "lessor" means the lessor of any such chattels, or the bailor or person owning dairy cattle under a feeding agreement; "lessee" means the lessee of any such chattels or the bailee or person feeding dairy cattle. For the purposes of this section bovine animals of the Galloway, Hereford, Polled Hereford, Aberdeen Angus, shorthorn (other than milking shorthorn), and Brahma breeds or crossbreeds within any of said breeds, and steers of any breed or crossbreed, including dairy breeds and crossbreeds, are not "dairy cattle."

*Recording*

(b) Unless any such contract is recorded in accordance with subsection (d) of this section within 10 days after the contract is executed, every provision therein reserving title or property in any such chattels to the lessor after possession of the chattels is delivered to the lessee shall be void as to any purchaser, creditor or encumbrancer who, without actual knowledge of such provision, in good faith

and for value purchases the chattels from the lessee or acquires a security interest therein or lien thereon by security agreement, attachment or levy, before the contract is so recorded, and as to any other creditor who, without actual knowledge of such provision, in good faith and for value becomes a creditor after possession of the chattels is delivered to the lessee and before the contract is so recorded, and as against any such purchaser, creditor or secured party title or property in any such chattels shall be conclusively presumed to have been transferred to the lessee unless the contract is so recorded.

*Security interest; acquisition; priority*

(c) Without limiting the generality of subsection (b) of this section, for the purpose of this section a secured party having a security interest in livestock or other animate chattels and whose security agreement provides that it shall cover any such chattels subsequently acquired by the debtor shall be deemed to acquire a security interest upon any such chattels, the possession of which is thereafter delivered to the debtor under any contract as above defined, at the time possession thereof is acquired by the debtor, and such security interest shall be prior and superior to the right, title or interest of the lessor under any such contract unless the contract is recorded within 10 days after the contract is executed.

*Acknowledgment; proof; certification; recordation; residence*

(d) Any such contract must be acknowledged or proved and certified and must be recorded

All the Shamrock cattle at the debtor's feedlot were branded with Shamrock brands, properly registered to Shamrock, both in Arizona and California. Certificates of brand registration were issued to Shamrock by the California Department of Food and Agriculture (D.F.A.).

The loans were collateralized by security agreements covering Shamrock's assets, including its cattle. The principal sums advanced by PCA totaled $2,900,000. PCA and its attorneys also appear not to have known of the recording requirements of Cal.Civ.Code § 2980.5. However, PCA did perfect its security agreement with Shamrock under the California, Cal.Comm.Code § 9401(1)(c), and Arizona, A.R.S. § 44-3140A(1), versions of the Uniform Commercial Code.

Over a period of months, from October 1980 until about August 1981, Shamrock purchased cattle and left them to be raised at the Black & White feedlot in Santa Maria, California. When Black & White's Chapter 11 bankruptcy petition was filed on April 23, 1982, some 3,535 heifers and 57 bulls, owned by Shamrock and worth some $2.4 million, were feeding at the plaintiff-debtor's facilities. At the time, as indicated, Shamrock owed PCA approximately $3,000,000 for acquisitions and operations, including feedlot costs paid to Black & White.

In mid-1981, the plaintiff-debtor was converted to a limited partnership, under California law, in an effort to bring additional funding into the various Black & White operations. Despite this influx of funds, Black & White eventually found it necessary to file the Chapter 11 petition. Shortly thereafter, Black & White, acting as a debtor-in-possession, filed a complaint to avoid the interest of Shamrock in the cattle held in its Santa Maria feedlots, pursuant to Cal.Civ.Code, § 2980.5. Subsequently, it

filed an amended complaint also seeking to set aside the PCA interest in the Shamrock cattle.

On June 7, 1982, a motion for partial summary judgment was brought by Black & White against Shamrock, arguing that, under the facts not contested by the parties, Cal.Civ.Code § 2980.5, and 11 U.S.C. § 544(a), it was entitled to have the reservation of title in the defendant declared void and the Shamrock cattle held to be an asset of its estate. This motion was granted on August 11, 1982. The bankruptcy court's partial summary judgment on this motion has since been affirmed by these panels. *In re Black & White Cattle Co.,* 30 B.R. 508 (9th Cir. BAP 1983).

On September 27, 1982, a second partial motion for summary judgment was brought by Black & White, this time against PCA. The bankruptcy court granted this motion on December 14, 1982, and the instant appeal ensued.

## I. ISSUES

At the outset, appellee contends that the summary judgment against Shamrock is decisive of the issues in this appeal. However, the present dispute involves the PCA, as a secured creditor, claiming a pre-existing perfected security interest under the Uniform Commercial Code. The essential issue is whether non-compliance with the feedlot recording statute, Cal.Civ.Code, § 2980.5, displaces or overrides a perfected security interest in dairy cattle. The parties and the issues thus differ markedly, requiring considerations independent of those in the dispute between Shamrock as owner and the debtor.

■ Appellee further contends that even if the security interest were paramount, by

---

in the office of the county recorder of the county where the chattels are located at the time the contract is executed and also in the county where the lessee resides unless the lessee is a nonresident. Where the lessee is a corporation or a partnership the county of residence thereof for the purpose of recording

such contract shall be deemed to be the county wherein such corporation or partnership has its principal place of business within this State.

(Added by Stats.1951, c. 412, § 2. Amended by Stats.1953, c. 1783, § 1; Stats.1963, c. 819, § 17.)

virtue of Cal.Comm.Code § 9306(2)[2] it was waived or terminated because "disposition (of the collateral) was authorized by the secured party." Presumably the disposition by PCA was with its knowledge of and assent to the cattle having been sent to the debtor's feedlot. Appellant argues that the disposition contemplated by § 9–306(2) is a transfer by the owner of the collateral which must be explicitly authorized by the secured creditor. In this case, the disposition or transfer of the collateral, if it occurred at all, was brought about by Shamrock's failure to comply with § 2980.5. Such a lapse was not a disposition by Shamrock, let alone PCA, as contemplated by § 9–306(2).

There are subsidiary or collateral issues relating to whether, because the cattle were branded, and considering the lack of recourse by the cattle dealing community to the record provided by § 2980.5, there could have existed the bona fide class of purchasers or creditors contemplated by that statute. This issue was treated in the prior Black & White case, albeit in a divided opinion. Because we believe our treatment of the primary issues stated above to be dispositive, we need not deal with these subsidiary issues.

### II. § 2980.5 and the U.C.C.

#### A.

Appellee contends, essentially, that § 2980.5 is a recording statute, the purpose of which is to allow the creditors of a dairy cattle feedlot operator to rely on the appearance of ownership unless the record provided by the statute notifies them to the contrary. Since notice would be dependent on tracing the record through the name of the bailee, Black & White, it would not be possible to discover the interest of a secured creditor of the bailor without recordation of the agreement to which the owner as bailor and the bailee are parties. A U.C.C. filing by a secured creditor of the

owner/bailor would provide no point of reference for prospective purchasers or creditors of the bailee. It was possible for PCA, if it were conversant with § 2980.5, as it should have been, to have ensured compliance therewith.

The most telling argument against appellee's position is that the statute's sanction for non-compliance is addressed to reservation of "title or property in any such chattels *to the lessor (bailor)* ..." (emphasis supplied). There is no indication in the statute that it is intended to encompass those who have previously perfected underlying security interests, by giving public notice under the U.C.C.

Section 2980.5 is not oblivious to the U.C.C. Section 2980.5(a) excludes from its operation agreements intended to create security interests under § 9–102(1)(a) of the U.C.C. Section 2980.5(c) adds to those categories of parties benefiting from non-recordation, the claims of the bailee's creditors holding U.C.C. security interests in cattle. These claims would attach to after-acquired livestock.

The California legislature, in enacting the foregoing legislation, by excluding U.C.C. security interests from its reach, demonstrated its knowledge of the U.C.C. and its intention that the perfection of a security interest between the feedlot operator and a secured creditor would be governed by the U.C.C. rather than § 2980.5. It also included a U.C.C. secured creditor amongst those whose rights would attach to the livestock of a bailor who failed to record under § 2980.5. These specific provisions highlight the absence of any requirement or direction that the holder of underlying U.C.C. security interest must comply with § 2980.5.

#### B.

In attempting to perceive what the legislature intended as to § 2980.5, a salient factor is the narrow scope of the statute.

---

**2.** U.C.C. § 9–306(2) provides:
Except where this Article [division] otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition

was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.

It applies only to transactions involving the lease or bailment of dairy cattle and designates only the immediate parties to such transactions. The U.C.C., on the other hand, is of very broad scope and governs, virtually, all security transactions. It encompasses the secured parties' rights against third parties even to the extent of giving the secured creditor the right to follow proceeds of the collateral in the hands of strangers to the agreement. Section 2980.5 does not articulate such a reaching out.

It is unusual that two statutes with possibility of over-lap exist and raises the question if it was intended by the California legislature that § 2980.5 should limit or invalidate perfected third party security interests in property owned by a party to the lease or bailment. Since § 2980.5 does not distinguish between third party lenders who know or do not know about the lease/bailment, may it be assumed that the legislature was willing to place at risk rights of third party creditors, even those who did not know of the feedlot contract? There is little likelihood that it was the intention of the legislature, when it enacted the U.C.C., for secured creditors—banks, for example—holding security interests in cattle herds to constantly police the movement of dairy cattle. Since it is well known that owners of various kinds of cattle commit them to feedlots, simply for feeding and also for sale or lease, obviously the legislature would not intend that parties having extended credit to the owner of cattle, who perfected their security interests under the U.C.C., would be held, nevertheless, to the duty of continually investigating whether or not their debtors had leased the dairy cattle or placed them on a feedlot so that there might be timely compliance with § 2980.5.

▉ The U.C.C., so long as the secured creditor does not authorize or acquiesce in the parting of ownership by the debtor of the collateral, does not require such surveillance. The secured party, pursuant to § 9–306(2) and § 9–201, may follow the collateral or claim the proceeds in the hands of other parties in the event of unauthorized disposition of the collateral. This principle will be discussed further below.

Without some indication in the legislative history, or specific language in the statute itself, the legislature should not be held to have intended that a perfected security interest be voided by the secured party's debtor having engaged in a lease or bailment of dairy cattle, with or without the knowledge of a secured creditor who is relying on a perfected security agreement.

The two statutes run on separate tracks. There is no indication that § 2980.5 was intended to add to the requirements of the U.C.C. for perfection of a security agreement which happened to cover dairy cattle. If this statute, so narrowly delimited as to subject matter and parties had been intended to affect a statute of universal application, it would stand to reason that the legislature would have stated its intent explicitly.

Only a clear mandate of the legislature should bring about a deviation, on behalf of so limited a constituency, from the virtually universal application of and reliance on the U.C.C. Such a mandate is conspicuously absent.

### III. *DISPOSITION OF CATTLE UNDER THE U.C.C.*

The alternative theory urged by the debtor is based on the contention, assuming PCA held a perfected U.C.C. security interest, that it was waived pursuant to § 9–306(2) because "disposition (of the collateral) was authorized...." This contention does not square with logic, or case law. Assuming that PCA knew the cattle were being committed to the feedlot, it would not consciously give up or waive its right to collateral by authorizing non-compliance with § 2980.5. To put it otherwise, had Shamrock recorded, there would be no contention as to "disposition." What brings the contention of disposition into play is Shamrock's failure to record. Obviously, authorization cannot be derived from this premise.

▉ The authorization contemplated by § 9–306(2) should not be lightly implied, *In*

*re Ellsworth,* 722 F.2d 1448 (9th Cir.1984). In support of this principle PCA cited *Central California Equipment Company v. Dolk Tractor Company,* 78 Cal.App.3d 855, 144 Cal.Rptr. 367 (1978). In *Dolk,* the court first held that, when a security agreement expressly required written consent to transfer collateral, such authorization to sell or otherwise dispose of this security, for Cal.Comm.Code § 9–306(2) purposes, had to be given in writing. "Mere acquiescence [was] insufficient." *Id.* at 862, 144 Cal.Rptr. at 371.

Despite this apparent restriction, the *Dolk* court nevertheless acknowledged the possibility of an implied authorization to sell or dispose of collateral but noted that "[w]hile we interpret 'or otherwise' *we believe that such an implied agreement should be found with extreme hesitance and should generally be limited to the situation of a prior course of dealing with the debtor permitting disposition.*" *Id.* (emphasis supplied.)

Notwithstanding the *Dolk* decision, Black & White argues since nothing in the Shamrock-PCA security agreement required written consent for the feedlot operations, *Dolk,* because of its observation as to a requirement of written consent, is inapplicable to the facts of this case. The plaintiff-debtor would have the panel simply look to the fact that PCA voluntarily permitted the Shamrock cattle to feed in the Santa Maria, California lot, without a recordation of the Shamrock interest under Cal.Civ.Code § 2980.5, and derive from this act an implied authorization of disposition under Cal.Comm.Code § 9306(2).

In this regard, as PCA has observed, each of the cases of implied authorization cited by Black & White involved a factual situation in which the secured party knew of the contemplated transfer of collateral, or of the debtor's pattern of making such transfers, and then declined to prevent such a disposition of his security. As indicated, PCA does not appear to have been aware of the possibility of even an involuntary transfer to Black & White. This lack of awareness did not merely stem from PCA's ignorance of Cal.Civ.Code § 2980.5. PCA was also uninformed as to the whole set of circumstances under which this statute eventually became operative. After PCA became aware of the facts which eventually gave rise to the claim of transfer, it was no longer in a position to affect the course of events instituted by the debtor-in-possession to defeat the ownership and security interests of Shamrock and PCA.

We believe as held in *Ellsworth, supra,* and stated in *Dolk* that "an implied agreement should be found with extreme hesitancy." An authorization to transfer cannot be implied from knowledge and/or actions of PCA, based on the uncontested portion of the record before the trial court.

### IV. CONCLUSION

We hold that the security interest of PCA in the Shamrock dairy cattle was not, as a matter of law, voidable under Cal.Civ.Code § 2980.5. We also conclude that PCA did not authorize, for purposes of Cal.Comm.Code § 9306(2), the presumptive transfer of title in the subject dairy cattle from Shamrock to Black & White. The partial summary judgment upon which this appeal is based is REVERSED and this matter REMANDED for further proceedings consistent with this opinion.