In re SUNRISE R.V. INC., Debtor.

Bankruptcy No. 288–8309–B–11.
Motion No. JAP–1.

United States Bankruptcy Court,
E.D. California.

Sept. 28, 1989.

Jeffrey A. Paris, Paris and Paris, Santa Monica, Cal., for moving party Yegen Associates, Inc.

Kimber B. Goddard, Langlois, MacDonald & Webster, Sacramento, Cal., for John Carr and Alice Carr, creditors.

Kenneth R. Smith, Fair Oaks, Cal., for Sunrise R.V., Inc.

Howard S. Nevins, Hefner, Stark & Marois, Sacramento, Cal., for ITT Commercial Finance Corp.

Gregory J. Hughes, Boyden, Cooluris, Hauser & Saxe, Sacramento, Cal., for Gen. Elec. Capital Corp.

## MEMORANDUM OF DECISION

DAVID E. RUSSELL, Bankruptcy Judge.

### FINDINGS OF FACT

On or around August 14, 1987, Kenneth J. Ede (hereinafter "EDE") purchased a

1988 "Lindy Deluxe Housecar" (hereinafter "Lindy") (vehicle identification no. 1FDK83017HHA98409) from All Seasons R.V. in Yuba City, California for a total purchase price of $48,898.76. The security agreement executed by and between EDE and All Seasons R.V. stipulated, inter alia, that the former "agree[d] ... not to ... transfer any interest in the vehicle." The sales contract and security agreement were thereafter assigned on a date uncertain to movant Yegen Associates, Inc. (hereinafter "YEGEN").

On December 22, 1988, EDE traded the Lindy to Sunrise R.V., Inc. (hereinafter "SUNRISE") for a $5,000.00 credit against a 1989 "Cruise Air Housecar". There is no direct evidence of record showing that EDE ever notified YEGEN or otherwise obtained its permission to dispose of the Lindy. At the time of transfer to SUNRISE approximately $17,118.52 was due and owing on the EDE/YEGEN contract. On December 29, 1989 John and Alice Carr (hereinafter "CARRS") traded their 1978 Dodge Motorhome to SUNRISE and applied the credit towards a down-payment on the Lindy.[1]

In the meantime, SUNRISE had filed a voluntary Chapter 11 petition in bankruptcy on December 15, 1988.[2] Upon ex-parte application by one of SUNRISE's floor plan financiers for an order enforcing the cash collateral provisions of 11 U.S.C. § 363 and for adequate protection of its secured interest in SUNRISE's inventory, this court entered an order on December 28, 1988 which, inter alia, required SUNRISE to immediately establish a cash collateral account separate and apart from its regular operating account and to deposit therein "all monies presently in its possession or received after the entry of this order from the sale of the Debtor's inventory ..."[3]

On January 4, 1989, after having obtained a loan from their lender (Golden One Credit Union), the CARRS tendered a cashier's check in the amount of $23,000.00 (the balance of the purchase price owing on the Lindy Housecar) to SUNRISE executive secretary Kathy Adams (hereinafter "ADAMS"). For reasons not made clear from the evidence, ADAMS' attempts to deposit the CARRS' check into the cash collateral account at Security Pacific were unsuccessful. Consequently, ADAMS deposited the check into SUNRISE's general operating account at Bank of America on or around January 10, 1989.

Predictably, the proceeds of the CARRS' check mysteriously disappeared[4] from the general account, YEGEN was never paid the $17,118.52 then due and owing pursuant to its security agreement, and none of the proceeds from the CARRS' purchase were ever deposited into the cash collateral account. Despite repeated demands by the CARRS, YEGEN refuses to deliver the ownership certificate of title ("pink slip") and has brought the above-entitled motion in an effort to recover its payoff demand from the existing funds in the cash collateral account. General Electric Capital Corporation (hereinafter "GECC") and ITT Commercial Finance Corporation (hereinafter "ITT"), two of SUNRISE's floor plan lenders, have objected to YEGEN's motion claiming perfected security interests in all proceeds in the cash collateral account.[5]

The CARRS support YEGEN's motion, but seek an order creating a $30,000.00 priority lien in the cash collateral account proceeds in their favor in the event this court determines that YEGEN retains its

---

1. The CARRS were given a $6,000.00 credit towards the $29,000.00 purchase price on the Lindy Housecar. The bankruptcy trustee evidently sold the CARR's trade-in to Perry Kollander for $6,200.00 on or around April 29, 1989.

2. The case was subsequently converted to Chapter 7 on March 7, 1989.

3. DEBTOR finally established a cash collateral account (No. 593–014–434) at Security Pacific National Bank on January 5, 1989.

4. Although no solid proof was offered in support of his contention, counsel for SUNRISE speculated at the hearing that the money was used to pay unauthorized rent.

5. A complete accounting of all deposits into the cash collateral account was prepared by ADAMS and filed with her declaration.

security interest in the Lindy Housecar and that YEGEN may not satisfy its claim from the cash collateral proceeds.

## ISSUES

The battle lines have been drawn as follows; first, who as between YEGEN and the CARRS, holds title to the Lindy Housecar? Second, as between GECC, ITT, YEGEN, and the CARRS, who may properly claim an interest in the sequestered cash collateral proceeds?

## DISCUSSION

### i) *Jurisdiction*

Because the above-entitled civil proceeding "arises in or [is] related to" a case under title 11 of the United States Codes, this court maintains "original jurisdiction". (28 U.S.C. § 1334). Furthermore, as matters concerning the administration of the estate (28 U.S.C. § 157(b)(2)(A)), determinations of the validity, extent, or priority of liens (28 U.S.C. § 157(b)(2)(K)), and other proceedings affecting the liquidation of the assets of the estate (28 U.S.C. § 157(b)(2)(O)) are considered "core proceedings", this court has the authority to enter final orders in respect thereto. (28 U.S.C. § 157(b)(1)).[6]

### ii) *Status of Yegen's Security Interest in the Lindy Housecar*

As a preliminary matter, the parties do not dispute that YEGEN had properly perfected its security interest in the Lindy Housecar.[7] There is, furthermore, no dispute that the California Commercial Code (hereinafter "CCC") as opposed to the Vehicle Code (hereinafter "Veh.C.") governs the effect of perfection as well as the priority and validity of YEGEN's security agreement. (Veh.C. §§ 6301, 6303 [8] ).

■ Generally, whether a security interest encumbering certain collateral survives the sale or disposition of that collateral depends upon whether the particular disposition was "authorized" by the holder of the security interest. Specifically, CCC § 9306(2) provides as follows:

(2) Except where this division or subdivision (4) of Section 8321 [inapplicable] otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof by the debtor unless his action was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor. (CCC § 9306(2); Stats.1963, c.819, § 9306 (emphasis added)).

Notwithstanding the above-referenced rule, the Commercial Code provides additional protections to a good faith (CCC § 1201(19)) purchaser of goods in the "ordi-

---

6. The court notes that a proceeding to determine the "extent of a lien or other interest in property" is more appropriately entertained by way of an adversary proceeding (Bankruptcy Rule 7001 et seq.). However, there being no objection to the form of the proceeding and it appearing that all parties were properly noticed and given sufficient opportunity to be heard, this court finds that the interests of justice would be more fully served by determining the merits of said motion without further delay.

7. YEGEN has at all relevant times been in possession of the certificate of ownership which is sufficient to perfect its interest in the vehicle under both the Commercial Code* and the California Vehicle Code**.

*CCC § 9302(4) provides in relevant part that "[a] security interest in a vehicle required to be registered under the Vehicle Code which is not inventory may be perfected only as provided in the Vehicle Code."

**Vehicle Code § 6301, governing the perfection of a security interest in vehicles registered under that code and provides in pertinent part as follows;

"When the secured party ... or his or her assignees, has deposited with the department a properly endorsed certificate of ownership showing the secured party as legal owner ... the deposit constitutes perfection of the security interest and the rights of all persons in the vehicle shall be subject to the provisions of the Uniform Commercial Code ..."

8. Veh.C.§ 6303 provides as follows;

Except as provided in Sections 5905, 5907 and 5908 [inapplicable to this case], the method provided in this chapter for perfecting a security interest on a vehicle registered under this code is exclusive, but the effect of such perfection, and the creation, attachment, priority and validity of such security interest shall be governed by the Uniform Commercial Code.

nary course of business" [9]. Of immediate relevance to the subject dispute, for example, is CCC § 9307(1) [10] which allows a buyer in the ordinary course of business to take an interest in goods free of any security interest created by his or her seller regardless of whether said purchaser had knowledge of the security interest and regardless of whether said interest has been properly perfected. Likewise, CCC § 2403(2) provides that:

> (2) Any entrusting [11] of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in ordinary course of business. (Stats.1967, c.799, p.2207, § 4.)

█ Thus, a buyer in the ordinary course of business will take goods free of the interests created by his or her seller (CCC § 9307(1), and free of any interest asserted by a secured party that assented to (CCC §§ 2403(2),(3)) or otherwise authorized the sale or disposition of the collateral in question. (CCC § 9306(2)). As will become apparent below, however, although the above-referenced provisions ostensibly shift the risk of loss from the good faith purchaser to the secured party the Commercial Code will not generally insulate a good faith purchaser of a *used vehicle* from the claim

of a lienholder whose lien on said vehicle was never satisfied due to the default of an insolvent dealer.

█ There can be no dispute that the CARRS qualify as "buyers in the ordinary course of business" as the evidence is undisputed that they purchased the Lindy "in good faith and without knowledge that the sale to [them was] in violation of the [YEGEN] ownership rights" (CCC § 1201(9)). Thus, they will take free of any security interest created by their seller, SUNRISE. (CCC § 9307(1) (supra)). Furthermore, they will take free of any security interest, perfected or otherwise, held by anyone who acquiesced either to the EDE delivery to SUNRISE or SUNRISE's retention of the Lindy for the purpose of sale, locating a buyer, etc. (CCC §§ 2403(3),(4)) [12]. They will not, however, take free and clear of the YEGEN security interest.

First of all, pursuant to CCC § 9307(1) the CARRS may defeat only those security interest created by SUNRISE. Because SUNRISE did not "create" the security agreement between EDE and YEGEN's predecessor in interest, YEGEN's interest will not be affected by the mechanics of § 9307(1). [13] Likewise, although EDE clear-

---

9. A "buyer in the ordinary course of business" is defined in the Commercial Code as a "person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind ..." (Cal.U.C.C. § 1201(9)).

10. CCC § 9307(1) provides as follows:
    (1) A buyer in ordinary course of business ... takes free of security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence. (Stats.1963 ch.819, § 9307).

11. "Entrusting" is defined by CCC § 2403(3) to include ... "any delivery and any acquiescence in retention of possession for the purpose of sale, obtaining offers to purchase, locating a buyer, or the like; regardless of any condition expressed between the parties to the delivery or acquiescence and regardless of whether the procurement of the entrusting or the possessor's disposition of the goods have been such as to be larcenous under the criminal law. (Amended by Stats.1967, c. 799, p. 2207, § 4).

12. The court can divine no reason why the subject transaction should not be subject to the provisions of Division 2 (sale of goods), specifically §§ 2403(2),(3). Clearly the sale of the Lindy by EDE to SUNRISE and by SUNRISE to the CARRS qualifies as a "sale of a good". Furthermore, as the underlying policy of § 2403(2) is to "protect the merchantability of goods in the possession of a dealer" (*Security Pacific National Bank v. Goodman* (1972) 24 Cal.App.3d 131, 138, 100 Cal.Rptr. 763) application of said code section to these facts appears to be appropriate.

13. The evidence does not support a finding that SUNRISE was EDE's agent so as to force YEGEN within the confines of § 9307. There was no agreement that SUNRISE would solicit a buyer on EDE's behalf. Rather, the agreement was that EDE would receive a stated credit toward the purchase of his new vehicle in exchange for his interest in the Lindy Housecar. Having received the benefit of the bargain, EDE relinquished his ownership interest in the Lindy to SUNRISE. (CCC § 2401(2) ("Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical

ly "entrusted" the Lindy to SUNRISE ("a merchant who deals in goods of that kind") thereby abandoning his rights in that vehicle to the CARRS, no substantial evidence exists to support a finding that YEGEN acquiesced [14] to SUNRISE's retention of possession so as to bring it within the definition of an "entrustor".

■ Having failed to satisfy the elements of CCC §§ 9307(1) and 2403(2), the CARRS must look to the general provisions of CCC § 9306(2) for relief. In order to prevail under that section, the CARRS must prove that "the disposition [of the collateral] was authorized by the secured party [YEGEN] in the security agreement or otherwise." As was mentioned above in this court's findings of facts, the security agreement between EDE and YEGEN's predecessor in interest precluded any transfer of EDE's interest in the vehicle. Notwithstanding an express prohibition against resale in the underlying security agreement, however, courts will strip a security holder of its interest in collateral upon a finding that said creditor "impliedly authorized" the disposition of the collateral. (*Central Cal. Equip. Co. v. Dolk Tractor Co.* (1978) 78 Cal.App.3d 855, 862, 144 Cal.Rptr. 367; *Producers Cotton Oil Co. v. Amstar Corp.* (1988) 197 Cal.App.3d 638, 646, 242 Cal.Rptr. 914; See generally, 37 A.L.R.4th 787).

■ Nonetheless, the authorization contemplated by CCC § 9306(2) should not be lightly implied. (*In re Black & White Cattle Co.* 46 B.R. 484, 488 (9th Cir.B.A.P. 1984) citing *In re Ellsworth* 722 F.2d 1448 (9th Cir.1984)). The court in *Dolk* set forth the following standard:

"...[W]hen a security agreement expressly prohibits the disposition of collateral without the written consent of the secured party, in order for a court to find an authorization permitting disposition free of the security interest within the

meaning of section 9306, subdivision (2), there must either be actual prior or subsequent consent in writing by the secured creditor manifesting a purpose to authorize the disposition free of the security interest. Mere acquiescence is insufficient. While we interpret "or otherwise" in section 9306, subdivision (2), to permit an implied agreement, we believe that such an implied agreement should be found with extreme hesitancy and should generally be limited to the situation of a prior course of dealing with the debtor permitting disposition ..." (*Central Cal. Equip. Co. v. Dolk Tractor Co.*, (supra) 78 Cal.App.3d at 862, 144 Cal.Rptr. 367 (emphasis added)).

As was noted in the CCC § 2403 analysis above, this court is unable to find that YEGEN acquiesced to the disposition by SUNRISE of the Lindy Housecar. It goes without saying, therefore, that a finding of "implied authorization" would likewise be without factual support. In any event, reading the requirement suggested in *Dolk* that "implied authorization be limited to situation of a prior course of dealing with the debtor" literally, the CARRS' are simply out of luck; not only is it not apparent that YEGEN and SUNRISE ever previously dealt with each other, but there is absolutely no evidence of record describing YEGEN's standard course of dealing in regard to payoffs on security agreements.

Pursuant to the above analysis, therefore, the court must find that notwithstanding the fact that they paid the full sales price, the CARRS have purchased the Lindy Housecar subject to the YEGEN lien in the amount of $17,118.52.

iii) *YEGEN Entitlement to SUNRISE's Security Pacific Cash Collateral Account*

■ YEGEN insists that irrespective of this court's determination regarding the state of its security interest in the original

delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place ...")).

**14.** "Acquiescence" has been defined as "unprotesting assent". (Webster's II New Riverside University Dictionary (Riverside Publishing Co.

(1984)). Having considered the record, however, the court on balance is not substantially convinced that YEGEN did in fact assent to the disposition of the Lindy. Further, the court can conceive of no reason why YEGEN would have or should have assented to resale prior to the absolute satisfaction of its lien on that vehicle.

collateral, it nevertheless retains a secured interest in the proceeds of sale pursuant to Cal.U.C.C. § 9306(2). (Supra). As a preliminary matter, this court disagrees that YEGEN properly preserved its security interest in the proceeds of sale.[15] Even assuming *arguendo*, however, that its interest in the proceeds of sale from the disposition of the Lindy Housecar was properly perfected within the confines of Cal.U.C.C. § 9306(3), the security interest will extend only to "identifiable proceeds". (Cal.U.C.C. §§ 9306(2) (supra), 9306(4)[16]). The parties are in agreement that the proceeds from the sale of the Lindy Housecar never made it into the cash collateral account. Rather, the consensus seems to be that the proceeds were used without court authorization to pay rent to SUNRISE's landlord. Consequently, because the proceeds from the sale of the Lindy Housecar were never deposited into the cash collateral account YEGEN is not entitled to any distribution from those funds.

iv. *CARRS Entitlement to Cash Collateral Account Proceeds*

■ Likewise, the CARRS have failed to convince this court that they maintain any ascertainable rights to the proceeds in the cash collateral account. They may not assert an interest in the proceeds of the Lindy sale pursuant to CCC § 9306(2) (assuming arguendo that said section applies to the CARRS) because those proceeds are no longer "identifiable". Further, failure to "perfect" (CCC § 9304(1) supra) whatever security interest they might have claimed to the proceeds disqualifies the CARRS from any distribution they otherwise would have been entitled to pursuant to CCC § 9306(4).[17]

■ Finally, moving from the provisions of Division 9, there is no basis for imposing either an equitable lien or a constructive trust upon the proceeds in the cash collateral account. The ADAMS accounting shows and the parties generally agree that all funds in the cash collateral account were derived solely from the sale of ITT and GECC's collateral. Because any conceivable fraud or wrongdoing was perpetrated by or on behalf of SUNRISE, the imposition of any trust upon ITT or GECC's cash collateral would be unjustified absent a showing (which has not been

15. Although CCC § 9306(2) grants a continuing security interest in "any identifiable proceeds ..." of sale or disposition of the collateral, subdivision (3) of that section provides that the above-referenced security interest in proceeds "ceases to be a perfected security interest and becomes unperfected 10 days after receipt of the proceeds by the debtor unless ... "there exists a filed financing statement covering both the original collateral as well as the proceeds thereof, a filed financing statement covered only the original collateral but the proceeds are identifiable, or the security interest in the proceeds was properly perfected within the ten day grace period. (CCC § 9306(3)(a)-(c)). Although YEGEN clearly perfected its interest in the original collateral pursuant to the Vehicle Code (supra), none of the above-referenced exceptions apply because no financing statement was ever filed and, in any event, the proceeds of sale are no longer "identifiable". Furthermore, there is no indication from the record that any of the necessary steps to perfect an interest in cash proceeds were ever initiated. (See e.g., CCC § 9304(1)).

16. Cal.U.C.C. § 9306(4) provides in relevant part that:

(4) [i]n the event of insolvency proceedings instituted by or against a debtor, a secured party with a perfected security interest in proceeds has a perfected security interest only in all of the following proceeds:

(a) In identifiable noncash proceeds ...

(b) In identifiable cash proceeds in the form of money which is neither commingled with other money nor deposited in a deposit account prior to the insolvency proceedings ...

(c) In identifiable cash proceeds in the form of checks and the like which are not deposited in a deposit account prior to the insolvency proceedings ... (Emphasis added).

17. The court, furthermore, cannot accept the contention that the CARRS have a right in the cash collateral proceeds to the extent that they represent proceeds from the sale of their Dodge trade-in. Even assuming that the proceeds from resale can be traced to the cash collateral account, the CARRS relinquished all ownership rights in the Dodge to SUNRISE upon "sale" of said vehicle for a credit against the Lindy (CCC § 2401(2) (supra)) or, at the very latest, upon resale to the buyer in the ordinary course of business (CCC § 2403(2) (supra). Consequently, the CARRS may not now claim a right to any proceeds recovered from the resale of that vehicle.

made) that either of those parties wrongfully benefited from SUNRISE's misconduct.

## DISPOSITION

The foregoing shall constitute this court's findings of fact and conclusions of law. Pursuant to the foregoing memorandum of decision YEGEN will retain its lien on the Lindy Housecar subject to whatever rights the CARRS have to possession and the equity therein. (*Security Pacific National Bank v. Goodman* (1972) 24 Cal. App.3d 131, 100 Cal.Rptr. 763). Furthermore, neither the CARRS nor YEGEN have any recourse to the sequestered proceeds in the SUNRISE cash collateral account at the Security Pacific National Bank.

Counsel for YEGEN shall submit an order in accordance herewith.